1  JAMES J. TORRES, State Bar No. 320192
   BENJAMIN J. TOLMAN, State Bar No. 301942
2  TORRES & TOLMAN
   201 Spear Street, Suite 1175
3  San Francisco, CA 94105
   Telephone:  (415) 212-7748
4  Email:      jtorres@torrestolman.com
               btolman@torrestolman.com
5
   *Attorneys for Plaintiff Julian Mijares*
6
                UNITED STATES DISTRICT COURT
7
               NORTHERN DISTRICT OF CALIFORNIA
8

9  JULIAN MIJARES,                        Case No.:  4:23-cv-398

10          Plaintiff,                    **COMPLAINT FOR:**

11      v.                                VIOLATION OF CALIFORNIA
                                          GOVERNMENT CODE SECTIONS 12940 et
12 BRENTWOOD UNION SCHOOL                 seq. RACE AND NATIONAL ORIGIN
   DISTRICT; ROXANE JABLONSKI-LIU in      DISCRIMINATION
13 her official and individual capacities; CHRIS
   CALABRESE in his official and individual VIOLATION OF CALIFORNIA
14 capacities; and DOES 1 through 20, inclusive, GOVERNMENT CODE SECTIONS 12940 et
                                          seq. GENDER/SEX DISCRIMINATION
15          Defendants.
                                          VIOLATION OF CALIFORNIA
16                                        GOVERNMENT CODE SECTIONS 12940 et
                                          seq. RETALIATION
17
                                          VIOLATION OF CALIFORNIA
18                                        GOVERNMENT CODE SECTIONS 12940 et
                                          seq. FAILURE TO PREVENT
19                                        DISCRIMINATION AND RETALIATION

20                                        UNFAIR BUSINESS PRACTICES

21                                        VIOLATION OF 42 U.S.C. §1983 RACIAL
                                          DISCRIMINATION
22
                                          VIOLATION OF 42 U.S.C. §1983
23                                        RETALIATION

24                                        VIOLATION OF 42 U.S.C. §1981 RACIAL
                                          DISCRIMINATION
25
                                          VIOLATION OF 42 U.S.C. §1981
26                                        RETALIATION

27                                        REQUEST FOR PUNITIVE DAMAGES

28                                        **DEMAND FOR JURY TRIAL**

## NATURE OF THE ACTION

1. Plaintiff Julian Mijares has dedicated his life's work to educating children. Mr. Mijares has been a teacher for over 25 years, and proudly served as an assistant principal of Bristow Middle School. In his capacity as assistant principal, Mr. Mijares was praised for his school leadership, even being recognized as a California administrator of the year in 2021. He was the only male Latino administrator in the Brentwood Union School District ("BUSD") and was on track for a promotion that would have enabled him to have an even greater positive impact in education. Mr. Mijares' professional calling was being fulfilled.

2. Everything Mr. Mijares had worked for 25 years to accomplish in education was swiftly and unjustly taken from him in May 2021. When Defendant Chris Calabrese, a BUSD assistant superintendent, made discriminatory comments about Black children, Mr. Mijares vocally objected. In retaliation, Defendant Calabrese would go on to deny Mr. Mijares a deserved promotion.

3. Days later, after Mr. Mijares provided polite and constructive feedback to two white female teachers as part of his regular administrative duties, both teachers joined together in falsely accusing Mr. Mijares of raising his voice. BUSD Assistant Superintendent Roxane Jablonski-Liu quickly decided to punish Mr. Mijares. Based solely on a false and minor allegation of wrongdoing, Defendant Jablonski-Liu called Mr. Mijares a "safety concern" and summarily barred him from entering school property. Because he is Latino, Defendant Jablonski-Liu presumed Mr. Mijares dangerous and guilty.

4. BUSD's own investigation eventually uncovered that Mr. Mijares had been subjected to false allegations by the teachers; Defendant Jablonski-Liu nevertheless kept Mr. Mijares out of work for over one year. And after Mr. Mijares made multiple reports to Defendant Jablonski-Liu and the California Civil Rights Department that he was being subjected to employment discrimination, Defendant Jablonski-Liu demoted him to a P.E. teacher, foreclosing his ability to serve as a school administrator.

## THE PARTIES

5. Plaintiff Julian Mijares is a United States citizen. From 2017 to 2022, Plaintiff was employed in California by Brentwood Union School District as an Assistant Principal at Bristow Middle School. Plaintiff Mijares is Mexican American.

6. Defendant Brentwood Union School District ("BUSD" or "Defendant") is a government agency that operates elementary and middle schools in Contra Costa County including Bristow Middle School in Brentwood, California. Defendant Brentwood Union School District is a public entity organized and existing under the laws of the State of California.

7. Defendant Roxane Jablonski-Liu was an Assistant Superintendent of Human Resources hired by Defendant Brentwood Union School District and, during all relevant periods, was employed by BUSD and was an agent of BUSD. Defendant Jablonski-Liu acted within the course and scope of her employment and agency with Defendant BUSD at all times. Plaintiff sues Defendant Jablonski-Liu in her official and individual capacity.

8. Defendant Chris Calabrese was an Assistant Superintendent hired by Defendant Brentwood Union School District and, during all relevant periods, was employed by BUSD and was an agent of BUSD. Defendant Calabrese acted within the course and scope of his employment and agency with Defendant BUSD at all times. Plaintiff sues Defendant Calabrese in his official and individual capacity.

9. The true names and capacities of defendants named as DOES 1 through 20, inclusive, are presently unknown to Plaintiff, who therefore sues said individual and corporate entity defendants by such fictitious names. Plaintiff will amend this compliant to set forth the true names and capacities of these fictitious defendants when they are ascertained. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitious defendants has participated in the acts alleged in this complaint.

10. Unless otherwise specified, "Defendants" as used herein shall refer collectively to Defendants Brentwood Union School District, Jablonski-Liu, Calabrese and DOES 1-20, inclusive.

11. Upon information and belief, at all relevant times, each of the Defendants, including DOES 1-20, inclusive, was the agent, servant, employee, co-conspirator and/or joint venture of each of the other Defendants. In doing the things herein alleged, each and every Defendant, as well as each and every Brentwood Union School District officer, manager, employee, agent, or assign mentioned herein other than Plaintiff, was acting within the course and scope of this agency, employment, conspiracy, and/or joint venture, and was acting with the consent, permission and authorization of each of the other Defendants. All actions as alleged in the causes of action stated herein, except for those of Plaintiff, were ratified, approved, and/or authorized by the Defendants with full knowledge of such acts. Defendants are thus jointly and severally liable for such actions.

## JURISDICTION AND VENUE

12. This action arises under 42 U.S.C. §§ 1981(a) and 1983. Plaintiff invokes jurisdiction over his federal claim pursuant to the provisions of 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The acts and practices complained of herein occurred in the County of Contra Costa, California, within this judicial district.

13. Jurisdiction over Plaintiff's pendent state law claims is appropriate under 28 U.S.C. § 1367. The state law claims are related to the claims brought pursuant to the original jurisdiction of the court, and form part of the same case and controversy under Article III of the United States Constitution.

14. This Court has personal jurisdiction over all defendants as the legal violations occurred in Contra Costa County, and the Defendants conduct business in Contra Costa County, which is located within this judicial district.

15. Assignment to the Oakland Division of the United States District Court for the Northern District of California is appropriate pursuant to Northern District Local Rule 3-2(d).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16. Plaintiff has exhausted his administrative remedies.

17. On or about September 8, 2021, Plaintiff filed a complaint against Brentwood Union School District with California's Civil Rights Department alleging multiple violations of

California's Fair Employment and Housing Act ("FEHA"). Plaintiff received a Right to Sue letter from the Civil Rights Department on August 3, 2022. On January 26, 2023, Plaintiff filed an additional complaint against Defendants with the Civil Rights Department alleging multiple violations of the FEHA. Plaintiff received a Right to Sue letter from the Civil Rights Department on January 26, 2023.

**FACTUAL BACKGROUND**

18. Julian Mijares has spent his career teaching thousands of children in Contra Costa County since 1998. In 2016, Mr. Mijares began working as an Assistant Principal at Bristow Middle School. In April 2021, Mr. Mijares was selected by the Delta Charter of the Association of California Administrators as the Secondary Co-Administrator of the Year for 2020-2021.

19. In his years serving as an Assistant Principal, Mr. Mijares was the only male Latino school administrator in BUSD. All other BUSD male administrators in the school district were white.

20. On April 30, 2021, BUSD renewed Mr. Mijares' contract to serve as an Assistant Principal for the 2021/2022 school year.

21. During his tenure, Mr. Mijares witnessed discriminatory animus permeate the highest levels of BUSD—an animus that BUSD would eventually direct against Mr. Mijares.

22. In the beginning of May 2021, Mr. Mijares attended a training for Bristow Middle School staff and community. In attendance was Assistant Superintendent Chris Calabrese, who at the time was the BUSD Director of Student Services. During the training, Mr. Calabrese shared that when he calls a Black child "articulate," he means that the child is "talking like a white kid." Mr. Mijares vocally objected against Mr. Calabrese's discriminatory treatment of children. Rather than admit fault, Mr. Calabrese dug into his position, offering that President Barak Obama was also "articulate."

23. Race had played a factor in Mr. Calabrese's actions before. During the 2017/2018 school year, Mr. Mijares was investigating an allegation that a male student had touched a female student's leg at school without consent. Mr. Calabrese travelled to Bristow Middle School to discuss this matter. Mr. Mijares explained to Mr. Calabrese that the investigation was pending

because key witnesses, including the female student who made the allegation, had not been immediately available for an interview. Mr. Calabrese responded by stating, "We have a white girl stating she was touched by a black boy, and we haven't suspended the boy? What is this going to look like in the newspaper?" Mr. Calabrese's discriminatory statement shocked Mr. Mijares, who still refused to act against a child without a proper investigation.

24. Race presented as an animating factor in BUSD's actions beyond Mr. Calabrese as well. In 2021, BUSD required all administrators to read a book called, *White Fragility*. During a meeting of the entire BUSD administrative council held to discuss this book, the BUSD Director of Special Education declared, "I'm a racist." The declarant did not offer further explanation, such as whether he viewed this as a problem he should work to resolve. What is clear, however, is that BUSD did not view such an admission as a problem, as the person who would have been responsible for investigating allegations (or confessions) of racism, Assistant Superintendent of Human Resources Roxane Jablonski-Liu, witnessed this admission of racism and took no action in response.

25. In May 2021, BUSD's discriminatory animus against Mr. Mijares came into stark focus.

26. On May 4, 2021, Mr. Mijares was supervising a school passing period when Bristow Middle School teacher Amy Ahlswede summoned him over to speak. Ms. Ahlswede stated that she had taken it upon herself to contact the BUSD technology coordinator in an effort to gain access to another teacher's work Google account while that teacher was out on medical leave. Ms. Ahlswede explained that once she gained access to the teacher's Google account, the teacher would lose access. Ms. Ahlswede and Mr. Mijares were standing approximately six (6) feet apart and speaking so that their voices could be heard through N-95 masks.

27. Ms. Ahlswede and Mr. Mijares had been speaking in front of Teacher Lori Whelan's classroom, which had its door propped open. Apparently upon hearing the conversation, Ms. Whelan exited the classroom and abrasively told Ms. Ahlswede and Mr. Mijares to "shush!" Ms. Ahlswede and Mr. Mijares went into Ms. Ahlswede's neighboring classroom to continue their conversation.

28. Continuing their conversation, Mr. Mijares explained to Ms. Ahlswede that she could not access a teacher's work Google account without that teacher's consent. He further communicated that it was important to have the approval of the school administration before undertaking an effort to gain access to another teacher's account and offered to write an email to Bristow Middle School Principal Jon Ovick regarding her request to access the information contained on the teacher's Google account. Ms. Ahlswede accepted that offer. Although Mr. Mijares had denied Ms. Ahlswede the ability to move forward with her initial efforts to access the teacher's Google account, their conversation was amicable, and Mr. Mijares followed up on the issue to make sure Ms. Ahlswede had the information she said she needed. Later the same day, Principal Ovick informed Mr. Mijares that he agreed that Ms. Ahlswede should not have access to another teacher's Google account without that teacher's consent and thanked Mr. Mijares for the way he addressed the situation.

29. The next day, May 5, 2021, Principal Ovick mentioned in passing to Mr. Mijares that Ms. Ahlswede was "frustrated" about her conversation with Mr. Mijares that had transpired the day before. Mr. Mijares was surprised to learn this, as he was hopeful that Ms. Ahlswede understood after their conversation that she should not have taken steps to gain access to another teacher's Google account without the administration's approval due to the potential privacy violation of a teacher who was on medical leave.

30. On the next day, May 6, 2021, two days after the original conversation with Ms. Ahlswede, Mr. Mijares encountered a student's parent who was expressing anger at the conduct of the student's case manager, Ms. Ahlswede. To prevent Ms. Ahlswede from being subjected to the parent's aggression, Mr. Mijares said to the parent that he would convey the parent's concerns rather than have the parent speak directly with Ms. Ahlswede. Mr. Mijares walked to Ms. Ahlswede's classroom and shared with her the issues raised by the parent. Mr. Mijares also said that given the aggressive conduct of the parent, Mr. Mijares would handle communications with the parent so that Ms. Ahlswede would not be subjected to the parent's hostility. Their conversation was friendly throughout. Immediately after this meeting, Mr. Mijares happened to speak with

Principal Ovick, who asked Mr. Mijares how the meeting had gone. Mr. Mijares described the details of his meeting with Ms. Ahlswede, and Principal Ovick expressed no concern.

31. Shortly later on May 6, 2021, Principal Ovick met with Mr. Mijares and Assistant Principal Allexandra Torres during a routine check-in. Mr. Mijares communicated that he wished to address Ms. Whelan's choice to harshly shush him and Ms. Ahlswede in front of students on May 4 and that he wanted to work with Ms. Whelan to find improved modes of communicating that would set a positive example in front of students. Mr. Mijares asked Principal Ovick to participate in this conversation with Ms. Whelan. Principal Ovick expressed no issue with Mr. Mijares addressing these topics with Ms. Whelan, but rather than attend the meeting himself, he told Ms. Torres to join in his stead. When Ms. Torres questioned this decision, Mr. Ovick responded that Ms. Torres needed to follow up with Ms. Whelan on a separate issue anyway. This separate issue involved Ms. Whelan accusing a Black student of wrongdoing. The school had not found that any wrongdoing had been committed by that student. Mr. Ovick wanted Ms. Torres to inform Ms. Whelan of the school's finding.

32. Mr. Mijares and Ms. Torres went to Ms. Whelan's room. Upon entering, Ms. Whelan immediately said in a hostile tone, "Why do I have the pleasure of having you both here?" She continued, "What's the punishment?" referring to the Black student she had accused of wrongdoing. Ms. Torres explained to Ms. Whelan that there would be no punishment at that time because wrongdoing had not been found. Mr. Mijares then asked to switch gears in order to address his minor concerns regarding Ms. Whelan's conduct on May 4. Mr. Mijares kindly explained that neither he nor Ms. Ahlswede had intended to cause any disruption to her class on May 4 and that he did not feel right about Ms. Whelan choosing to shush him and Ms. Ahlswede during their conversation and in view of other students. Mr. Mijares asked for Ms. Whelan to please offer him the professional courtesy of just talking with him in the future. Ms. Whelan unexpectedly became angry and said, "Unbelievable. You guys are ridiculous. I will be calling Roxane and you will be leaving now." Ms. Whelan was referring to Assistant Superintendent Roxane Jablonski-Liu. Mr. Mijares and Ms. Torres were stunned that Ms. Whelan had kicked them out of a classroom for

simply informing her that the target of her accusation would not be punished prematurely and communicating that professional courtesy would be appreciated in the future.

33. Seven (7) days after the last time Mr. Mijares had last spoken either to Ms. Whelan or Ms. Ahlswede, on May 13, 2021, Assistant Superintendent Roxane Jablonski-Liu—the Assistant Superintendent that Ms. Whelan had invoked by first name on May 6—called Mr. Mijares into a meeting. Mr. Mijares was blindsided when Ms. Jablonski-Liu placed him on administrative leave and barred him from entering BUSD property. Ms. Jablonski-Liu told him not to communicate with anyone over school email and made him immediately turn over his school keys, badge, I.D. and laptop. Ms. Jablonski-Liu called Mr. Mijares a "safety concern." She further stated that BUSD received "concerns and complaints regarding [Mr. Mijares'] behavior recently" and that staff members "don't feel safe."

34. Mr. Mijares was in shock, as he had never been accused of any kind of wrongdoing in his twenty years of teaching, let alone ever behaved in any way that could possibly cause a BUSD member to make any allegation of this kind that was credible. Mr. Mijares told Ms. Jablonski-Liu that he posed no safety threat to anyone. After Mr. Mijares asked who had made these allegations, Ms. Jablonski-Liu named Ms. Whelan and Ms. Ahlswede and stated that the allegations stemmed from incidents on May 4 and 6, 2021. She also stated that there were "additional concerns from additional people." Mr. Mijares was in disbelief.

35. Ms. Jablonski-Liu concluded the meeting by saying that she understood the impact this was having on Mr. Mijares and that BUSD would make Mr. Mijares aware of "the best next steps for everyone." Mr. Mijares was devastated that he was the subject of false allegations and that Ms. Jablonski-Liu had labelled him a "safety concern." He knew from Principal Ovick that Ms. Ahlswede was merely "frustrated" after he told her not to gain access to another teacher's Google account on May 4. And after Principal Ovick casually mentioned this information, he presented Mr. Mijares with a letter of recommendation. "Mr. Mijares has an outstanding and well-deserved reputation as an Assistant Principal at Bristow Middle," Principal Ovick wrote in a letter dated May 5, 2021. "Mr. Mijares' positive attitude and energy have been evident in the positive steps

we have made as a staff in developing collective efficacy," he continued. "By modeling what is expected of students, Mr. Mijares' leadership has promoted an **overall *safer* school campus**."

36. Mr. Mijares had been gathering letters of recommendation as part of the application he submitted for a promotion to BUSD Coordinator of Alternative Education. Assistant Superintendent Calabrese was in charge of hiring for this position and had actually written Mr. Mijares a letter of recommendation, praising his focus on "safety." Mr. Calabrese also wrote, "His positive relationship with staff members, along with his focus on students, helped to create change in the school climate. He is a respected member of the administrative team. Julian is a deeply caring leader and led by his convictions and morals. I highly recommend him for an administrative role." Mr. Calabrese wrote this recommendation before Mr. Mijares objected against discriminatory treatment of children by challenging Mr. Calabrese's stated association between children's articulateness and race.

37. On May 17, 2021, Mr. Mijares was summoned to a meeting held by Assistant Superintendent Jablonski-Liu and Principal Ovick. For the first time, they asked Mr. Mijares questions about his interactions with Ms. Whelan and Ms. Ahlswede. After explaining what had happened, Mr. Ovick then asked Mr. Mijares if anything had "come up" for him as a result of these allegations and the process generally. In response, Mr. Mijares shared his belief that BUSD was discriminating against him because he is a person of color. Mr. Mijares further stated that the claim that Ms. Ahlswede was afraid of him because she did not gain access to another teacher's Google account sounded like a chapter out of *White Fragility*, BUSD's required reading, called "White Women's Tears," wherein the author describes the social hierarchical dynamic of a white woman's ability to shed tears and be believed and valued over a person of color—as was the case at hand. Mr. Mijares asked what allegations formed the basis of his forced leave, to which Ms. Jablonski-Liu said that Ms. Ahlswede and Ms. Whelan were "fearful" and were saying that Mr. Mijares was "agitated." Upon hearing this, Mr. Mijares began to break down in tears, unable to believe what he was hearing. Ms. Jablonski-Liu also confirmed that Ms. Whelan had called her as Ms. Whelan told Mr. Mijares she would do.

38. After this initial interview, about a week later on May 25, 2021, Ms. Jablonski-Liu issued Mr. Mijares a letter with the subject line, "RE: Investigation of Concerns of Bullying and Unprofessional Behavior". Ms. Jablonski-Liu wrote that Ms. Ahlswede had accused him of "shouting" at her on May 4, 2021, and that his "shouting" and "angry", "intimidating" behavior "escalated" when he entered her classroom. Ms. Ahlswede also alleged that on May 6, 2021, Mr. Mijares entered her classroom and "behaved in an angry and intimidating manner towards her." Ms. Jablonski-Liu wrote that Ms. Whelan claimed that he "confronted" her on May 6 because she had "shush[ed]" him. Ms. Jablonski-Liu informed that Anna Miller of the law firm Atkinson, Andelson, Loya, Ruud & Romo in Sacramento would be conducting an "impartial" investigation into the allegations pursuant to BUSD Policy 1312.1, which deals with complaints made by the general public against school staff.

39. On June 9, 2021, BUSD hired a white female for the Coordinator of Alternative Education promotion—the position that Mr. Mijares had been gathering letters of recommendation for and to which he had applied. The person hired was less qualified than Mr. Mijares and had been with the BUSD for a far shorter period. To add insult to injury, Assistant Superintendent Calabrese had not even offered Mr. Mijares an interview for the position.

40. Over seven (7) weeks after the first alleged incident occurred that was the subject of attorney Anna Miller's investigation, on June 24, 2021, Ms. Miller finally interviewed Mr. Mijares over video conference. In response to Ms. Miller's questioning, Mr. Mijares shared the facts surrounding his interactions with Ms. Ahlswede and Ms. Whelan on May 4 and 6, 2021, just as he had done with Principal Ovick and Assistant Superintendent Jablonski-Liu.

41. Over 11 weeks after the first alleged incident and after nearly the same amount of time since BUSD banned Mr. Mijares from entering school property, on July 22, 2021, Assistant Superintendent Jablonski-Liu met with Mr. Mijares to pressure him to resign before BUSD had determined the veracity of the allegations or even whether such allegations amounted to conduct worthy of disciplinary action. At this meeting, Ms. Jablonski-Liu stated that an investigative report had been issued and, while she had not thoroughly read this report and that no "particular determination" had been reached about the allegations, based on "initial findings" she believed

Mr. Mijares' conduct toward both Ms. Whelan and Ms. Ahlswede was "contrary to the district's general expectations of professionalism for administrators." Although she admitted that no determination had been reached based on the "impartial" investigation, Ms. Jablonski-Liu shared BUSD's predetermined judgment that BUSD would not permit Mr. Mijares to work as an administrator or work at Bristow Middle School generally. Ms. Jablonski-Liu said that because Mr. Mijares was under contract, Mr. Mijares had the choice of resigning or working as a substitute teacher until the end of the school year, at which point BUSD would release him after his contract expired. Mr. Mijares was in disbelief, shocked and devastated that his career was being taken from him when he had done nothing wrong.

42. The next day, on July 23, 2021, Ms. Jablonski-Liu allowed Mr. Mijares to access his office at Bristow Middle School to remove his personal items. Assistant Superintendent Calabrese met Mr. Mijares, who was accompanied by his wife, at the school and said the situation was "awkward" before he unlocked Mr. Mijares' office door. Once inside his personal office of five (5) years, Mr. Mijares closed his office door to share the very sad moment with his wife in private. Mr. Calabrese abruptly and forcefully opened the door without knocking and aggressively raised his voice at Mr. Mijares and his wife. "Why are you closing the door?", Mr. Calabrese demanded as though he were barking an order at criminals caught in the act. Mr. Mijares expressed that he wished to collect his personal items from his office alone with his wife. "Keep the door open", Mr. Calabrese combatively demanded. Mr. Mijares' wife began to cry, and the door remained open to Mr. Mijares' office as he collected his belongings.

43. On July 27, 2021, Ms. Jablonski-Liu emailed Mr. Mijares an "administrative determination" letter. Marked confidential, BUSD mailed the letter to another BUSD employee, as evidenced by the address listed, spreading BUSD's false and damaging allegations to uninvolved third parties within the school district. Ms. Jablonski-Liu wrote that the purpose of the letter was to provide the results of BUSD's investigation of complaints against Mr. Mijares by Ms. Ahlswede and Ms. Whelan, who alleged that he "bullied them and treated them inappropriately on May 4, 2021, May 5, 2021 and May 6, 2021." According to Ms. Jablonski-Liu, BUSD "reviewed and accepted [attorney] Ms. Miller's investigation report, and this letter sets forth the District's

decision based on the investigator's findings." Ms. Jablonski-Liu confirmed that BUSD would not allow Mr. Mijares to ever see the investigator's actual report.

44. The BUSD's "factual determinations," as recited by Ms. Jablonski-Liu, are riddled with falsities, such as the claim that Mr. Mijares "used an angry tone" and "shouted" at Ms. Ahlswede, and the claim that Mr. Mijares "agreed that [he] raised his voice because [he] was wearing an N95 mask." Beyond blatant falsities, Ms. Jablonski-Liu repeatedly demonstrated that she was straining to find evidence of wrongdoing against Mr. Mijares where none existed, stretching facts to fit her predetermined conclusion that Mr. Mijares would be ousted from his job after he complained of discrimination. For example, one of Ms. Jablonski-Liu's "factual determinations" was that Ms. Ahlswede admitted that she had contacted BUSD's IT to change another teacher's Google account password without prior authorization from her supervisors. However, Ms. Jablonski-Liu claimed that Mr. Mijares' comment to Ms. Ahlswede about adhering to BUSD's chain of command "suggest[s] you not only told Ahlswede 'no' but that you were upset." Such an illogical conclusion that an assistant principal's request for a teacher to follow proper channels and protocols suggests that the assistant principal was "upset" is just one example among many of Ms. Jablonski-Liu and BUSD manufacturing illusory evidence of wrongdoing against Mr. Mijares where no valid evidence of wrongdoing actually existed.

45. Importantly, Ms. Jablonski-Liu and BUSD also found that Mr. Mijares "***and [Ms]. Ahlswede*** began to yell as the conversation progressed," a finding made based on Ms. Whelan claiming that Mr. Mijares and Ms. Ahlswede were "both getting 'louder and louder.'" Thus, even based on Ms. Jablonski-Liu and BUSD's false statements and equivalencies, the alleged conduct amounted to Mr. Mijares *and* Ms. Ahlswede "both getting 'louder and louder'" for a brief time.

46. Regarding Ms. Ahlswede's allegations stemming from her May 6, 2021 interaction with Mr. Mijares, Ms. Jablonski-Liu offered sparse details, but generally relayed that Ms. Ahlswede and Mr. Mijares had a discussion about a particular student. With this, Ms. Jablonski-Liu claimed that "the information Ahlswede provided was not inconsistent with the information provided by [Mr. Mijares]." This is false, however, because Ms. Jablonski-Liu's May 25, 2021, letter stated the following: "On May 6, 2021, [Mr. Mijares] went into Ms. Ahlswede [sic]

classroom to discuss a student matter. She reported that were [sic] very angry during the exchange, [Mr. Mijares] made a number of erratic comments, and insisted that the student had disrespected [Mr. Mijares]." Ms. Jablonski-Liu failed to address Ms. Ahlswede's actual allegations because BUSD's investigator had found that Ms. Ahlswede lied. Referring to Mr. Mijares, Ms. Jablonski-Liu and BUSD concluded, "your comments to Ahlswede during your May 6 interaction do not suggest you were angry, unreasonable, or hostile as you were on May 4. You spoke to Ahlswede on May 6 regarding a student concern . . . . These are reasonable topics for a vice principal and teacher to discuss in the workplace. Although Ahlswede suggested that you made statements about going to one of the student's homes, there is insufficient evidence that you made these statements in an angry or offensive matter or that visiting the student was inappropriate under the circumstances."

47. However, in a blatant display of pretext, Ms. Jablonski-Liu disturbingly twisted the fact that Ms. Ahlswede had lied to BUSD during an investigation, illogically manipulating Ms. Ahlswede's serious misconduct into ammunition to be used against Mr. Mijares. "Ahlswede's concern regarding the May 6 conversation appears to be more of a reaction and feeling of uneasiness being around you in reaction to your May 4 behavior, as opposed to a concern regarding the substance of your conversation on May 6. The way Ahlswede was treated on May 4 and the uneasiness she felt on May 6 support the assertion that your behavior created a hostile work environment." Ms. Jablonski-Liu was so bent on reaching her predetermined goal of forcing out Mr. Mijares that even a finding that his accuser had lied about at least half of her allegations was bafflingly used in an attempt to bolster her credibility. Ms. Jablonski-Liu made every possible inference, even those that lacked any grounding in logic, against Mr. Mijares. Far from impartial, Ms. Jablonski-Liu's findings were designed to falsely implicate Mr. Mijares. In contrast, Ms. Jablonski-Liu made no adverse inference against Ms. Ahlswede's credibility—let alone took any remedial action against Ms. Ahlswede—for falsifying a serious allegation against Mr. Mijares and, according to BUSD's investigation findings, yelling at Mr. Mijares.

48. Regarding Ms. Whelan, Ms. Jablonski-Liu falsely concluded that Mr. Mijares stated to her, "'I did not appreciate the way you spoke to me . . . . [Mr. Mijares] then told Whelan she

COMPLAINT FOR DAMAGES

had been 'unreasonable and unprofessional.'" This is the extent of Ms. Jablonski-Liu's allegations of wrongdoing directed at Ms. Whelan. Although Ms. Whelan had alleged that Mr. Mijares behaved in a way toward her that made her "fearful", BUSD made no finding supporting such an allegation. Like its treatment of Ms. Ahlswede's falsifications, Ms. Jablonski-Liu and BUSD made no adverse inference against Ms. Whelan's credibility.

49. Based on the foregoing alleged conduct by Mr. Mijares, which BUSD's investigation found amounted only to "arguably overreacting," Ms. Jablonski-Liu damagingly and falsely labeled Mr. Mijares as "angry", "threatening", "intimidating", and "harassing", even claiming, as explained above, the fact that Ms. Ahlswede lied about her May 6 interaction with Mr. Mijares inexplicably showed that she felt "uneasiness . . . support[ing] the assertion that [Mr. Mijares'] behavior created a hostile work environment." Remarkably, immediately after accusing Mr. Mijares of creating a "hostile work environment," BUSD relied on Government Code section 12950.1—a section about state-mandated employer training and not about employee conduct—to find that Mr. Mijares **did not** engage in "abusive conduct."

50. Instead, Ms. Jablonski-Liu and BUSD "determine[d] by a preponderance of the evidence that [Mr. Mijares'] behavior towards Ahlswede on May 4 was inappropriate and contrary to the District's general expectations for professionalism", and that his "reaction to Ms. Whelan's behavior was inappropriate." **Incredibly, Ms. Jablonski-Liu then admitted that the "District does not have a formal policy that formally sets forth the district's expectations for professionalism or inappropriate conduct." BUSD thus based its "corrective action" against Mr. Mijares on a new, yet undefined standard BUSD invented to apply only to Mr. Mijares.**

51. Though it does not show in the quality of the investigation,[1] BUSD expended considerable resources reaching its finding against Mr. Mijares, considering this was the first time Mr. Mijares had ever been accused of any form of wrongdoing in his career and, even if the worst was to be believed, those findings amounted to him briefly "getting loud[]", as Ms. Whelan put it, at a teacher who the BUSD found was yelling at him and telling another teacher that she behaved

---

[1] Notably, BUSD, and presumably the law firm investigating, got the date of Mr. Mijares' interaction with Ms. Whelan wrong, falsely asserting that this conversation occurred on May 5, 2021.

unprofessionally. Yet, based on this, BUSD stated that it retained three (3) attorneys to interview 24 witnesses, not including the accusing teachers and Mr. Mijares. BUSD was on a very costly mission to search for, and ultimately invent, a basis to punish Mr. Mijares.

52. On August 11, 2021, Ms. Jablonski-Liu met with Mr. Mijares and issued him a "Determination" letter that set forth the BUSD's punitive action against him. The letter begins by reciting BUSD's purported factual bases for punitive action. Upon parsing claims of fact from her opinions on propriety and BUSD's undefined "general expectations", Ms. Jablonski-Liu proffers only two "facts" upon which her punitive action against Mr. Mijares was based: (1) Mr. Mijares was involved "in incidents involving two female teachers on May 4, 5 & 6" and (2) "Many staff members at B.M.S. [Bristow Middle School] are aware of these incidents". Highlighting the importance of these "facts", Ms. Jablonski-Liu stated, "Based on these facts, I have concluded that you cannot continue as a site administrator in the District." Ms. Jablonski-Liu thus openly displayed disparate treatment of Mr. Mijares on the basis of his gender by punishing Mr. Mijares based on the fact that "two *female* teachers" complained against him. Moreover, Ms. Jablonski-Liu admitted that employees within the district had spread the allegations to "many staff members". As discussed above, BUSD acknowledged these allegations included false statements by Ms. Ahlswede. Not only did BUSD acknowledge that it had defamed Mr. Mijares, but Ms. Jablonski-Liu admitted that BUSD would punish Mr. Mijares in part because BUSD had spread this defamation widely throughout the workplace.

53. Ms. Jablonski-Liu then gave Mr. Mijares what she characterized as "options". First, she offered to initiate a reassignment "for cause", with the Superintendent making the final decision. Ms. Jablonski-Liu noted that if he chose this option, while he would be able to supply his own response to the charges, "[n]o credentialed administrator could provide a thoroughly positive review of you". With this, Ms. Jablonski-Liu had apparently instituted a prior restraint on administrators' speech, at least insofar as it was favorable to Mr. Mijares. Second, Ms. Jablonski-Liu offered to demote Mr. Mijares to a substitute teacher. Third, Ms. Jablonski-Liu offered to pay three (3) months' salary and six (6) months' benefits to Mr. Mijares in exchange for his voluntary

resignation and signing of a "release agreement". Ms. Jablonski-Liu gave Mr. Mijares only three (3) business days to decide.

54. Mr. Mijares emailed Ms. Jablonski-Liu to again object to BUSD's unlawful actions. Mr. Mijares wrote, "I verbally stated during our 5/17/2021 meeting and again during our 8/11/2021 meeting, that I believe that the false allegations which initiated this disciplinary process and many of the actions taken against me throughout this process have been discriminatory, unjust, untrue, an attack on my character and additionally may include an invasion of my privacy." Ms. Jablonski-Liu never even acknowledged Mr. Mijares' complaints of discrimination.

55. Mr. Mijares also asked Ms. Jablonski-Liu to confirm the policies and regulations upon which BUSD was basing its actions against him. Mr. Mijares noted that Ms. Jablonski-Liu stated in the July 27, 2021 "administrative determination" letter that she relied upon BUSD policy 1312.1, but she instead enclosed policies 4144, 4244, and 4344. On August 23, 2021, Ms. Jablonski-Liu responded by stating that "Board Policy and Administrative Regulation 4144/4244/4344 were enclosed in error. Board Policy and Administrative Regulation 1312 .1 should have been attached." Confusingly, she then stated, "Both BP/AB 1312.l and 4144/4244/4344 apply to this situation and the procedures are similar. One significant difference is that 1312.1 provides that the employee/respondent may appeal the decision of the Superintendent/designee to the Board." To add to this confusion, Ms. Jablonski-Liu then wrote to Mr. Mijares on August 18, 2021, with the following conflicting information: "The determination and options were not based upon Board Policy other than BP/AR 1312.1. [sic] The options outlined in the letter are not 'disciplinary options,' and there has not been any reference to disciplinary action. The involuntary reassignment option is based upon California case law." Ms. Jablonski-Liu later quoted the attorney investigator regarding the determination of which policy to use for the complaint, writing, "1312.1 is a more general policy geared towards complaints of any nature (not investigated under another procedure) against employees. Given that this was an investigation into allegations of generally bad/bullying behavior this appeared to be the most appropriate policy to follow." Notably, BUSD policy 1312.1 governs complaints made by "***the public***" against employees and was inapplicable to the allegations against Mr. Mijares.

56. In the face of conflicting information and certain injustice, Mr. Mijares wrote to Ms. Jablonski-Liu on August 25, 2021, "Upon review of the documents that you have provided, I disagree with the results of the District's investigation and am exercising my employee appeals option. I am asking to address the BUSD Board." Although in her August 11, 2021 letter, Ms. Jablonski-Liu wrote that the Superintendent would make a final determination after Mr. Mijares was "entitled to respond in writing, and could meet with the Superintendent to review the charges and your response", Ms. Jablonski-Liu once again changed the rules for Mr. Mijares, writing on August 27, 2021, "the parties should consider and accept the decision of the superintendent's designee as final. However, you may ask to address the Board regarding the complaint. Please note, per AR 1312.1, the Board may elect to uphold this decision without hearing the Complaints."

57. By at least September 8, 2021, Ms. Jablonski-Liu had learned that Mr. Mijares had filed a complaint with the California Department of Fair Employment and Housing ("DFEH") alleging retaliation and discrimination on the basis of his race and gender.

58. On September 10, 2021, Mr. Mijares wrote a letter to the BUSD appealing Ms. Jablonski-Liu's determination with a detailed and factual refutation of her false factual findings and biased procedure. Mr. Mijares concluded, "I believe that the false allegations which initiated this disciplinary process and many of the actions taken against me throughout this process have been discriminatory, unjust, untrue, and an attack on my character."

59. Ms. Jablonski-Liu and BUSD refused to allow Mr. Mijares to meet with the Board. In a letter dated September 24, 2021, Ms. Jablonski-Liu informed Mr. Mijares that "in closed session on September 22, 2021, the District's Governing Board took action to adopt the written report and findings of the District's Internal Investigator in its entirety as the Board's own decision in the matter."

60. After barring Mr. Mijares from working at BUSD for an entire school year, Ms. Jablonski-Liu notified Mr. Mijares in a letter dated February 24, 2022, that BUSD's "Governing Board" had demoted him to "PE Teacher." She also informed him that he would not be permitted to begin work until July 25, 2022.

61. Because Ms. Jablonski-Liu did not provide any reason for the demotion, Mr. Mijares wrote a letter to the BUSD Governing Board requesting its written rationale pursuant to Education Code 44896. Ms. Jablonski-Liu responded in a letter dated March 15, 2022, writing simply, "The District does not have confidence in you to serve as a site administrator." She then stated, "there is no appeal process for the Board's decision. The Board's decision is final."

62. In the wake of the BUSD's false allegations against Mr. Mijares, its barring of BUSD employees from providing references to Mr. Mijares, and the fact that, because of BUSD's discriminatory actions against him, he had to disclose in applications that he had been asked to resign, Mr. Mijares has—as of yet—been unable to find employment as a site administrator outside of BUSD. BUSD demoted Mr. Mijares to a position as a P.E. teacher and moved him to a different school.

## **LEGAL CLAIMS**

### **FIRST CAUSE OF ACTION**

**(Race, Color, Gender and/or Sex Discrimination: Violation of Government Code § 12940(a))**

**(Against Defendant BUSD)**

63. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

64. At all relevant times herein mentioned, Defendant BUSD was an employer and Plaintiff was an employee of Defendant.

65. At all relevant times herein mentioned, the Fair Employment and Housing Act ("FEHA"), Gov. Code, § 12940, *et seq.*, was in full force and effect and was fulling binding upon Defendant BUSD as an employer. Section 12940(a) prohibits an employer from discriminating against an employee because of their race, color, gender, and/or sex (or some combination thereof).

66. Plaintiff's race, color, gender and/or sex (or some combination thereof) were substantial motivating reasons for Defendant BUSD's decision to subject Plaintiff to adverse employment actions, including, but not limited to, demoting Plaintiff and failing to promote Plaintiff, as well as engaging on a course of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of Plaintiff's employment.

67. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings, other employment benefits, and other economic losses, in addition to emotional distress, humiliation, shame, anxiety, depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

68. WHEREFORE Plaintiff prays for relief as set forth below.

**SECOND CAUSE OF ACTION**

**(Failure to Take All Reasonable Steps to Prevent Discrimination: Violation of Government Code § 12940(k))**

**(Against Defendant BUSD)**

69. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

70. At all relevant times herein mentioned, Defendant BUSD was an employer and Plaintiff was an employee of Defendant.

71. At all times herein mentioned, California's FEHA § 12940, *et seq.*, was in full force and effect and was fully binding upon Defendant BUSD. Specifically, § 12940(k) makes it an unlawful employment practice for an employer to fail to take all reasonable steps necessary to prevent unlawful discrimination from occurring.

72. Plaintiff was subjected to race, color, gender and/or sex discrimination in the course of his employment, which Defendant failed to take all reasonable steps to prevent.

73. This failure by Defendant was a direct, foreseeable, and proximate cause of the harm suffered by Plaintiff, which included substantial economic losses in addition to emotional distress, humiliation, shame, anxiety, depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

74. WHEREFORE, Plaintiff prays for relief as set forth below.

**THIRD CAUSE OF ACTION**

**(Retaliation for Engaging in Protected Activity: Violation of Labor Code § 12940(h))**

**(Against Defendant BUSD)**

75. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

76. At all relevant times herein mentioned, FEHA, Gov. Code, § 12940, *et seq.*, was in full force and effect and was fulling binding upon Defendant BUSD as an employer. Specifically, section 12940(h) makes it an unlawful employment practice for an employer to retaliate against any employee making complaints of, or opposing, discrimination or retaliation, or otherwise engaging in activity protected by the FEHA, including for seeking to exercise rights guaranteed under FEHA and/or assisting and/or participating in an investigation, opposing defendant's failure to provide rights, including rights to complain and to assist in a lawsuit, and/or the right to be free of retaliation.

77. Plaintiff's seeking to exercise rights guaranteed under FEHA, including the right not to be discriminated against for any unlawful purposes, opposing Defendant's failure to provide such rights, and filing a complaint for unlawful discrimination against Defendant with the DFEH and subsequently cooperating with the DFEH's investigation thereof, was a substantial motivating reason for Defendant's decision to subject Plaintiff to adverse employment actions, including, but not limited to, demoting Plaintiff and failing to promote Plaintiff, as well as Defendant's course of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of Plaintiff's employment.

78. Defendant's unlawful actions were a direct, foreseeable, and proximate cause of the harm suffered by Plaintiff, which included substantial losses in earnings, other employment benefits, and other economic losses, in addition to emotional distress, humiliation, shame, anxiety, depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

79. WHEREFORE Plaintiff prays for relief as set forth below.

**FOURTH CAUSE OF ACTION**

**(Retaliation: Violation of Labor Code § 1102.5)**

**(Against Defendant BUSD)**

80. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

81. At all relevant times, Defendant BUSD has been subject to the requirements of Labor Code section 1102.5, which applied to Plaintiff as an employee of Defendant.

82. Defendant punished Plaintiff with a series of adverse employment actions for his objections to Defendant's unlawful discrimination, for filing a complaint for unlawful discrimination against Defendant with the DFEH and subsequently cooperating with the DFEH's investigation thereof, and for his reports of unlawful discrimination to Defendant's supervisory employees who had authority to investigate or correct legal violations, for which he had reasonable cause to believe that the information disclosed violations of state laws, rules, and/or regulations.

83. Plaintiff's objections to Defendant's violations of the FEHA, his reports of these matters to Defendant's supervisor employees who had authority to investigate or correct legal violations, and his filing of a complaint alleging FEHA violations against Defendant with the DFEH and subsequently cooperating with the DFEH's investigation thereof, were contributing factors in Defendant's decision to punish Plaintiff with a series of adverse employment actions, including, but not limited to, demoting Plaintiff.

84. Defendant's unlawful actions were a direct, foreseeable, and proximate cause of the harm suffered by Plaintiff, which included substantial losses in earnings, other employment benefits, and other economic losses, in addition to emotional distress, humiliation, shame, anxiety, depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

85. WHEREFORE Plaintiff prays for relief as set forth below.

## FIFTH CAUSE OF ACTION

**(Unfair Business Practices in Violation of California Business and Professions Code §§ 17200-17208)**

**(Against Defendant BUSD)**

86. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

87. The foregoing conduct, as alleged, violates the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*. Section 17200 of the Cal. Bus. & Prof. Code prohibits unfair competition by prohibiting, *inter alia,* any unlawful or unfair business acts or practices.

88. Throughout the course of Plaintiff's employment, Defendant committed acts of unfair competition, as defined by the UCL, by, among other things, engaging in the acts and practices described herein, including but not limited to subjecting Plaintiff to unlawful discrimination.

89. Defendant's conduct as herein alleged has damaged Plaintiff by, among other things, wrongfully demoting Plaintiff and failing to promote Plaintiff, and therefore was substantially injurious to Plaintiff.

90. Defendant's course of conduct, acts, and practices in violation of the California laws mentioned above violate the policy or spirit of such laws or otherwise significantly threatens or harms competition.

91. Plaintiff seeks disgorgement in the amount of the respective unpaid wages and all other legal and equitable relief under the UCL.

92. WHEREFORE, Plaintiff prays for relief as set forth below.

**SIXTH CAUSE OF ACTION**

**(Violation of 42 U.S.C. Section 1983 Racial Discrimination)**

**(Against Defendants Jablonski-Liu and Calabrese)**

93. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

94. Defendants Jablonski-Liu and Calabrese acted under color of state law in causing the harm alleged herein.

95. By the conduct alleged herein, Defendants Jablonski-Liu and Calabrese willfully and without justification deprived Plaintiff of his rights, privileges and immunities as secured to him by the laws and Constitution of the United States. All Constitutional rights covered, specifically including the due process and equal protection rights as afforded by the 14th (Fourteenth) Amendment in violation of 42 U.S.C. Section 1983.

96. WHEREFORE Plaintiff prays for relief as set forth below.

## SEVENTH CAUSE OF ACTION

### (Violation of 42 U.S.C. Section 1983 Retaliation)

### (Against Defendants Jablonski-Liu and Calabrese)

97. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

98. Defendants Jablonski-Liu and Calabrese acted under color of state law in causing the harm alleged herein.

99. By their conduct herein alleged, Defendants Jablonski-Liu and Calabrese intentionally, willfully and without justification, did retaliate against plaintiff because of his protective activity in opposing racial and ethnic discrimination in violation of 42 U.S.C. section 1983.

## EIGHTH CAUSE OF ACTION

### (Violation of 42 U.S.C. Section 1981 Racial Discrimination)

### (Against All Defendants)

100. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

101. In doing the acts alleged herein, defendants intentionally and without justification deprived Plaintiff of the rights, privileges and immunities secured to him by the Constitution and laws of the United States, including Plaintiff's right to be free from discrimination based on his race as provided by 42 U.S.C. Section 1981.

102. Plaintiff's race was a but-for cause for Defendants' decision to subject Plaintiff to adverse employment actions, including, but not limited to, demoting Plaintiff, failing to promote Plaintiff, as well as engaging on a course of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of Plaintiff's employment.

103. As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings, other employment benefits, and other economic losses, in addition to emotional distress, humiliation, shame, anxiety,

depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

104. By perpetrating the acts as alleged in this complaint, defendants acted in conformance with Defendants BUSD's custom, practice and policy of discriminating against Latinos.

105. Defendants' conduct as detailed in this complaint violates 42 U.S.C. Section 1981.

106. WHEREFORE plaintiff prays for relief as set forth below

## NINTH CAUSE OF ACTION

### (Violation of 42 U.S.C. Section 1981 Retaliation)

### (Against All Defendants)

107. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

108. Plaintiff confronted Defendants about the discrimination they were perpetrating against him in refusing to promote him, punishing him, and refusing to let him work based on his race.

109. Plaintiff told Defendants that he was pursuing his legal rights in notifying the DFEH of Defendants' discrimination against him based on his race.

110. In response, Defendants retaliated against Plaintiff and further refused to promote him, punished him, refused to let him work, and demoted him based on his race.

111. Plaintiff engaged in protective activity, and Defendants knew Plaintiff was engaged in protected activity when they decided to retaliate against Plaintiff.

112. As a result of engaging in protected activity, Defendants retaliated against Plaintiff in violation of 42 U.S.C. Section 1981.

113. WHEREFORE Plaintiff prays for relief as set forth below

### REQUEST FOR PUNITIVE DAMAGES

### (California Civil Code Section 3294)

114. Plaintiff incorporates by reference each of the foregoing paragraphs as if they were set forth fully herein.

COMPLAINT FOR DAMAGES

115. Defendants Jablonski-Liu and Calabrese committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. The conduct of Defendants Jablonski-Liu and Calabrese as alleged herein is extreme and outrageous and falls within the protection of California Civil Code Section 3294 for the imposition of punitive damages against Defendants Jablonski-Liu and Calabrese.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, prays for judgment against Defendants as follows:

1. For compensatory damages, including but not limited to, lost back pay, plus interest, lost fringe benefits and future lost earnings and fringe benefits, lost equity, damages for emotional distress and pain and suffering, according to proof allowed by law;

2. For punitive damages allowed by law;

3. For restitution and/or disgorgement;

4. For an award to Plaintiff of costs of suit incurred herein and reasonable attorneys' fees;

5. For an award of prejudgment and post-judgment interest; and

6. For an award to Plaintiff of such other and further legal and equitable relief as the Court deems just and proper.


Dated: January 26, 2023                    TORRES & TOLMAN


                                           By: /s/ James J. Torres
                                               James J. Torres

                                           *Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, plaintiff hereby demands a trial by jury on all issues triable to a jury in each cause of action of his complaint.

Dated: January 26, 2023

TORRES & TOLMAN

By: /s/ James J. Torres
James J. Torres

*Attorneys for Plaintiff*